IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

RICARDO CHILDRESS,           }
TDCJ-CID NO.433105,          }
        Plaintiff,       }
v.                           }                    CIVIL ACTION G-05-467
                             }
ANTHONY COLLINS, *et al.*,   }
        Defendants.      }

<u>OPINION ON DISMISSAL</u>

Plaintiff Ricardo Childress, an inmate incarcerated in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID"), seeks declaratory and compensatory relief pursuant to 42 U.S.C. § 1983 for the pain that he allegedly suffered as a result of his job assignments. (Docket Entry No.30). Defendants[1] Anthony J. Collins, Dr. Charles D. Adams, and Dr. Kwabena Owusu have filed a motion for summary judgment (Docket Entry No.42), to which plaintiff has filed a response. (Docket Entry No.50). For the reasons to follow, the Court will grant defendants' motion for summary judgment and dismiss plaintiff's claims against all defendants.

<u>I. CLAIMS</u>

Plaintiff, who has been incarcerated in TDCJ-CID since October, 1986, claims to suffer from seizures due to a Vietnam war injury, spondylolysis of the LS Spine with a partially deformed six "vertebra and arthoarthoritis," degenerative joint disease, acid reflux disease, and carpal tunnel syndrome. (Docket Entry No.1). In his first complaint, filed on August 26, 2005, he complained of the following:

---

[1] Defendants have advised the Court that Case Manager Robert Harris died on March 29, 2008. (Docket Entry No.40).

On November 8, 2004, plaintiff returned to the Terrell Unit of TDCJ-CID from a bench warrant and was assigned to work in the cannery.  (*Id.*, page 7).  Plaintiff complained about the assignment because the work conflicted with his "permanent" medical restrictions.  (*Id.*).  Dr. Owusu corrected the error and plaintiff was assigned to the medical utility squad.  (*Id.*).  On July 25, 2005, plaintiff was sent to the Estelle Unit to be fitted for new glasses; he returned to the Terrell Unit on July 27, 2005.  (*Id.*).  Two days later, plaintiff learned that he had been assigned to the cannery.  (*Id.*).  On August 1, 2005, plaintiff complained to Warden Collins and Case Manager Harris that the work assignment conflicted with his permanent medical restrictions.  (*Id.*).  On August 5, 2005, plaintiff requested to see a doctor to assist him in being reassigned to a more appropriate work status.   (*Id.*).   He was informed that the medical department did not assign jobs and that he should go to the chain of command.  (*Id.*).  On August 8, 2005, plaintiff sent another request to see a doctor, which was denied.  (*Id.*).  On August 9, 2005, plaintiff complained to Unit Health Administrator Andrepont about the job assignment, who told him that this complaint needed to be addressed by security because the medical staff did not assign jobs.  (*Id.*).  The same day, plaintiff again requested to see a doctor and the request was denied by a response directing him to discuss the job assignment with the Classification Committee.  (*Id.*).

On August 10, 2005, plaintiff reported to work so that he could talk with Industrial Specialist IV Linda Peterson.  (*Id.*, page 8).  Plaintiff told Peterson that his restrictions were permanent and she tried to assign him to the cannery tool, where it was not too hot.  Plaintiff's offense class, however, did not allow such assignment.  (*Id.*).  Consequently, plaintiff suffered constant lower back pain as he worked on his feet in the cannery for about seven hours.  (*Id.*).

On August 11, 2005, plaintiff did not report to work but went to the infirmary to talk to Nurse Hennenberg, who refused to let him see a doctor.  (*Id*.).  Plaintiff complained by an I-60 to Warden Collins that he had been denied access to the doctor.  (*Id*.).  On August 12th, Hennenberg again denied plaintiff access to a doctor, so plaintiff tried to talk to Physician's Assistant Jung.  (*Id*.).  He too, refused to let plaintiff see a doctor.  (*Id*.).  On August 13, 2005, plaintiff attempted to resolve the job assignment dilemma with Nurse Pacheco, but she told him to see Classification and to send another sick call request to Physician's Assistant Bouttee.  (*Id*.).  On August 15, 2005, plaintiff was instructed to "[p]ick up Tylenol at pill window."  (*Id*.).  Plaintiff claims that Tylenol is ineffective.  (*Id*.).

Plaintiff did not report to work on August 15, 2005; consequently, he was served with a disciplinary case.  (*Id*., page 9).  On August 16, 2005, plaintiff reported to the cannery.  (*Id*.).  While working a vegetable conveyer, he suffered a mild seizure and nearly passed out.  (*Id*.).  Later that afternoon, he talked to Nurse Hennenberg in the infirmary, but she refused to let him see a doctor.  (*Id*.).  She did not take his blood pressure.  (*Id*.).

On August 17, 2005, plaintiff attempted to talk with Bouttee to request that he carry an I-60 to Peterson, advising her that plaintiff would not turn out for work anymore because his health was in danger.  (*Id*.).  Bouttee refused, so plaintiff had an inmate carry the I-60 to Peterson.  (*Id*.).

On August 18, 2005, plaintiff requested to see Dr. Owuso, to review his medical records, and to discover the person who had removed seven of his nine permanent work restrictions.  (*Id*., page 10).  The same day Physician's Assistant Jung saw plaintiff at the infirmary and advised him to drink plenty of water for the seizures but refused to reinstate the medical restrictions.  Plaintiff also filed a step 1 grievance because Collins and Harris had

refused to grant his request for restoration of good conduct credit that was unlawfully forfeited in 1992.  (*Id.*).  The next day, the grievance was returned with a notation that the issue was not grievable.  (*Id.*).

On August 19, 2005, plaintiff's left leg went numb while he was in the law library.  (*Id.*).  He submitted a sick call request to see Dr. Owuso.  (*Id.*)  Plaintiff continued to try to talk with medical personnel about the removal of medical restrictions.  (*Id.*).  On August 22, 2005, plaintiff sought assistance from Lt. Zarate to see Dr. Owusu.  (*Id.*).  Zarate told plaintiff to see the nurses; plaintiff told him that the nurses were intercepting his sick call requests.  Zarate took the sick call request to Dr. Owusu, but Owusu did not see plaintiff.  (*Id.*).

On August 23, 2005, plaintiff complained to Case Manager Harris, who told him that he could do nothing for him and to stop harassing him.  (*Id.*).  Harris threatened, "I will show the reverse and you will know what it is.  This is an issue for court action."  (*Id.*).

Plaintiff claims this "punishment" started after he sent a letter to Warden Collins in July 2005, requesting a "nunc pro tunc" restoration of good conduct credit that were unlawfully forfeited in 1992, and after plaintiff filed a civil suit against Warden White and Major Rains in 1989,[2] and after he filed a step one grievance complaining of the cannery work assignment in mid-August, 2005.  (*Id.*, page 9).  Plaintiff sought declaratory and injunctive relief against defendants on the following grounds:

1. Warden Anthony J. Collins and Case Manager Robert E. Harris refused to ensure that plaintiff was medically classified and to transfer him to a job assignment consistent with plaintiff's medical restrictions;

2. Industrial Specialist IV Linda M. Peterson refused to inform Harris that plaintiff's job assignment was hazardous to plaintiff's health;

---

[2] *See Childress v. Adams*, Civil Action No.6:89-00602 (E.D. Tex., Nov. 5, 1991) (dismissed as frivolous).

3.      Nurse Deborah Hennenberg twice refused to let plaintiff see a physician regarding his medical restrictions;

4.      Physician's Assistant Felicia Bouttee refused to correct plaintiff's medical restrictions;

5.      Nurse Alice Pacheco told plaintiff to see classification about his job assignment; and,

6.      Physician's Assistant Paul Jung refused to hear plaintiff's complaint about the nurses refusing to allow him to see a doctor and refused to correct plaintiff's permanent work restrictions.

(*Id.*).

In his First Supplemental Complaint, plaintiff sought relief from the same defendants and added two new defendants—Drs. Kwabena A. Owusu and Charles Adams. (Docket Entry No.17).  Plaintiff claimed that in November 2004, Dr. Adams arbitrarily removed eight of his medical restrictions without conducting a physical examination so that defendants Collins and Harris could assign plaintiff to work regardless of his medical condition.  (*Id.*, page 3).  Plaintiff complained to Dr. Owusu, who called the UCC Chief, Case Manager Robert Harris. (*Id.*, page 4).  Thereafter, plaintiff was reassigned to the medical utility squad and was not required to work.  (*Id.*).

Plaintiff also complained that on July 27, 2005, when he returned from the Estelle Unit eye clinic, he was assigned to work in the cannery.  (*Id.*).  Plaintiff complained to no avail and twice refused to work, for which he received two disciplinary cases.  (*Id.*).  On September 8, 2005, Collins, Harris, and Mr. Nix, the cannery supervisory, agreed that plaintiff should be re-assigned to the laundry.  (*Id.*).  On October 12, 2005, plaintiff saw Dr. Owusu about the "painful work assignment."  (*Id.*).  Dr. Owusu refused to reclassify plaintiff even though he was aware of plaintiff's serious physical ailments.  (*Id.*).  Owusu, however, called Harris and recommended that plaintiff be reassigned to the medical utility squad, but Harris refused.  (*Id.*).  Plaintiff claims

5

that Owusu told him that someone from the UCC—either Collins or Harris—had called the medical department and asked that inmates be medically reclassified so that they could be assigned to work.  (*Id*.).

On February 10, 2006, Dr. Owusu informed plaintiff that the x-rays taken on December 14, 2005, confirmed that plaintiff had degenerative joint disease and "arthoartritis" in the lower back L4 and L5 levels.  (*Id*.).  Dr. Owusu, however, still refused to reclassify plaintiff according to his "painful medical condition."  (*Id.*).

In his Answer to Court Ordered Interrogatories, filed December 1, 2006, plaintiff stated his belief that Collins and Harris retaliated against him by assigning him to work in the cannery in spite of his medical restrictions because he declared himself to be a Native American. (Docket Entry No.22).  Plaintiff claimed that Collins and Harris, who are African-American, did not look favorably on Native Americans.  (*Id*., page 1).  Plaintiff also complained that he endured unnecessary pain in his lower back from an old injury because of the cannery job.  (*Id*.).  He attached a copy of a step 2 grievance in which he complained that working in the laundry aggravated an old injury, which caused him to suffer back pain, shoulder pain, and wrist pain. (*Id*., pages 2-3).  The response to the grievance indicated that he was appropriately assigned in accordance with his medical restrictions.  (*Id.*, page 3).

In April 2007, plaintiff sought to amend and supplement his original pleadings. (Docket Entry No.24).  He indicated in said motion that he was assigned to work in the cannery from July 29, 2005 to September 8, 2005, and in the laundry from September 10, 2005, until November 17, 2006.  (*Id*., page 2).  Because it was unclear what relief plaintiff was seeking, the Court ordered plaintiff to file an amended complaint and cautioned him that such complaint would supersede any and all other complaints in this case.  (Docket Entry No.29).

Plaintiff filed the pending amended complaint on January 30, 2008.   (Docket Entry No.30).  In the amended complaint, plaintiff alleges the following:

Before July 29, 2005, he was medically unassigned because of health restrictions arising from his medical conditions.  (*Id*., page 6).  On July 29, 2005, he was assigned to cannery because on November 16, 2004, Dr. Adams removed eight of plaintiff's permanent work restrictions without an examination.  (*Id*., page 7).  Plaintiff claims he tried to resolve the error but Dr. Owusu told him that he did not assign jobs and that he should check with the UCC.  (*Id*.).  Plaintiff checked with Case Manager Harris and Warden Collins, both of whom told him that the medical department was the problem.  (*Id*.).  When plaintiff finally saw Dr. Owusu, he refused to restore the eight medical restrictions.  (*Id*.).  The work in the cannery aggravated the pain in his left shoulder and lower back.  (*Id.*, page 5).

Plaintiff further alleges that Dr. Owusu has refused his request to have someone perform carpal tunnel surgery on plaintiff's left hand.  (*Id.*, page 7).  Plaintiff complains that Owuso refused to refer him to the University of Texas Medical Center ("UTMB") in Galveston for nasal blockage that plaintiff experienced during a bout with the flu, although, he concedes that Owuso provided medication for the blockage.  Plaintiff maintains that Owuso has yet to prescribe an effective medication for plaintiff' nagging pain his right heel.  (*Id*.).

Plaintiff also alleges that defendants Linda Peterson, Deborah Hennenberg, Felicia Bouttee, Alice Pacheco, and Paul Jung "have repeatedly interfered with my trying to [indecipherable] doctor and get effective medical treatment of my medical needs."  (*Id*.).  Plaintiff claims that all these named defendants, collectively and independently, intended to cause him harm and to cause him to suffer and endure unnecessary pain, or to punish him in retaliation for refusing to endure the unnecessary pain in the work to which he was arbitrarily

assigned.  (*Id*., pages 7-8).  Plaintiff claims defendants breached their duty to plaintiff with respect to his health, safety, and permanent medical conditions in violation of TDCJ policy and the Eighth Amendment.  (*Id*., page 8).  He further claims that defendants conspired to impose upon him willful mental anguish, pain, and suffering while he was assigned to the cannery and the laundry.  (*Id*.).  Plaintiff seeks compensatory and declaratory relief.  (*Id*., page 9).

Defendants Collins, Adams, and Owusu move for summary judgment on grounds that they are entitled to qualified and Eleventh Amendment immunity and that they did not deprive plaintiff of any right, privilege or immunity necessary to support a constitutional violation under 42 U.S.C. § 1983.  (Docket Entry No.42).

## II. STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

## III. DISCUSSION

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984).  Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  To prevail on a section 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  A section 1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations.  *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).  Thus for plaintiff to recover, he must show that the defendants deprived him a right guaranteed by the Constitution or the laws of the United States.  *See Daniels v. Williams*, 474 U.S. 327, 329-31 (1986).

### A. Eleventh Amendment Immunity

Suits for damages against the state are barred by the Eleventh Amendment.  *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).  Under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.  *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).  Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court.  *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993).  This bar remains in effect when state officials are sued for damages in their official capacity.  *Cory v. White,* 457 U.S. 85, 89 (1982).

9

All defendants in this case are employees of the State of Texas or state agencies; therefore, plaintiff's claims seeking monetary damages against all defendants in their official capacities are barred by the Eleventh Amendment.  *See Will v. Michigan Dept of State Police*, 491 U.S. 58, 71 (1989) (suit not against official but state office); *Oliver v. Scott*, 276 F.3d 736, 742, 742 n. 5 (5th Cir. 2002).  Accordingly, all claims for monetary relief against all defendants in their official capacities are subject to dismissal.

## B. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  "Whether a defendant asserting qualified immunity may be personally liable turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law." *Fraire v. City of Arlington*, 957 F.2d 1268, 1272 (5th Cir. 1992).  In assessing the applicability of a qualified immunity defense, the court considers "whether plaintiff's allegations, if true, establish a constitutional violation" and whether defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).  When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002).  Even so, on summary judgment, the court must look to the evidence before it in the light most favorable to the plaintiff when conducting a qualified immunity inquiry. *Id.* at 323.

### 1. Conspiracy to Make Changes to Medical Restrictions

Plaintiff claims that Dr. Adams conspired with Warden Collins and Case Manger Harris to assign plaintiff to work in the cannery in July 2005, by arbitrarily removing eight of plaintiff's permanent medical restrictions on November 16, 2004, without conducting a physical examination.  (Docket Entries No.17, page 3, No.30, page 5).  Plaintiff claims that Dr. Owusu told him on October 12, 2005, after plaintiff had been re-assigned to the laundry, that someone from the UCC, *i.e.*, Collins or Harris, had called the medical department and asked that inmates be medically reclassified so that they could be assigned to work.  (Docket Entry No.17 page 4).

To establish a § 1983 cause of action based upon conspiracy, a plaintiff must allege facts that, liberally construed, establish (1) defendants' participation in a conspiracy involving state action, and (2) a deprivation of his civil rights in furtherance of the conspiracy by a party to the conspiracy.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992).  Plaintiff must also show that the conspirators had an agreement to commit an illegal act that resulted in the plaintiff's injury.  *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982); *Thomas v. City of New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982).

Although plaintiff was seen by Dr. Owusu on October 12, 2005, for complaints of chronic lower back pain (Docket Entry No.43-3, pages 7-8), the record reflects no evidence that Collins, Harris, or any other defendant requested that Dr. Adams modify plaintiff's HSM-18 in 2004.  Moreover, the record reflects no evidence of any kind of agreement among defendants. Nor is there any evidence that Dr. Adams modified plaintiff's permanent medical restrictions to effectuate a new job assignment.

UTMB policy dictates that the "HSM-18 may be reviewed and revised at the discretion of a physician" or other specific health care professionals. (Docket Entry No.42-9, page 2). The record shows that Dr. Adams examined plaintiff on November 16, 2004, for complaints of gastritis and acid reflux.[3] (Docket Entry No.42-2, pages 3-4. 14-15). Plaintiff's medical history was outlined on the examination record. (*Id.*). Adams specifically noted that plaintiff was an obese male. (*Id*.). Adams prescribed medication, discontinued plaintiff's medical utility assignment and restricted him to limited walking and no lifting over twenty pounds on the HSM-18. (Docket Entries No.42-2, pages 4, 15; No.42-4, page 18). Adams's actions were in accordance with UTMB policy, which does not provide for permanent medical restrictions. (Docket Entries No.42-9, page 2; No.47-2, page 3).

On November 18, 2004, plaintiff was assigned to the cannery. (Docket Entry No.42-14, pages 5-6). On December 14, 2004, Dr. Owusu examined plaintiff's complaints of "generalized musculoskeletal pain especially old fractured left shoulder." (Docket Entry No. 43, pages 3-4). Owusu recommended that plaintiff be assigned to the medical utility squad. (*Id.,* page 4). He did not modify plaintiff's HSM-18. The same day, plaintiff was re-assigned to the medical utility squad. (Docket Entry No.42-14, page 6). Plaintiff remained medically unassigned for almost eight months. (Docket Entry No.42-14, page 4). During this time, plaintiff's HSM-18 was not modified. (Docket Entries No.42-11, page 4; No.42-14, page 4).

The record further shows that plaintiff's medical restrictions were appropriate to his physical condition and medical record. Dr. Owen J. Murray, Chief Physician Executive with

---

[3] Plaintiff's medical records show that on November 8, 2004, plaintiff was examined by medical personnel upon his return to the Terrell Unit, in accordance with TDCJ-CID policy. (Docket Entries No.42-4, pages 24-25; No.42-5, pages 1-5; No.42-9, pages 2-7). He was medically unassigned. (Docket Entry No.42-14, page 5).

UTMB, attests that his review of plaintiff's medical record reflects the following, in pertinent part:

> Mr. Childress is a 68 year old male who entered TDCJ in October of 1986. He had a self-reported history of several lower back injuries, injuries to both shoulders, including a fractured left collar bone, and seizures.  Mr. Childress was, and has been, seen promptly and repeatedly by healthcare staff for his complaints during his incarceration.
>
> *    *    *    *    *
>
> Dr. Adams . . . reviewed Mr. Childress's medical record, specifically his previous radiology studies.  Based upon these reviews, Dr. Adams modified Mr. Childress's HSM-18, discontinuing his medically unassigned (job) status and adding restrictions of limited walking (less than 500 yards) and a lifting restriction (no greater than twenty pounds). When Mr. Childress complained about these changes, he was seen by Dr. Owusu approximately a month later who concurred with the HSM 18 as modified by Dr. Adams.
>
> I believe that these changes to the HSM-18 were justified, based upon my experience as a correctional physician and based upon my clinical judgment.  None of the radiology examinations of the lumbar spine done in 1997, 1998, and 2005 are consistent with the patient's complaint of severe debilitating pain or history of multiple traumatic injuries.  Mr. Childress has six lumbar vertebrae; this is seen in approximately 10% of the population and is not associated with any increased risk of pain or additional pathology.  There is no evidence of osteoarthritis or any disc abnormalities which would be commonly associated with significant lower back syndromes.  This lack of findings was demonstrated even as late as the 2005 films.

(Docket Entry No.47-2, pages 2-3).

Plaintiff states no facts and presents no evidence to contravene this record. Because the record does not reflect any agreement between Adams, Collins, Harris, or any other defendant to modify plaintiff's work restrictions on the HSM-18 and no evidence that Drs. Adams and Owusu did not follow protocol when modifying plaintiff's medical restrictions, plaintiff has failed to overcome the qualified immunity defense.  Accordingly, defendants are

13

entitled to summary judgment on this ground.  Furthermore, plaintiff's conspiracy claims against all defendants are subject to dismissal.

### 2. Retaliation

Plaintiff claims that Warden Collins and Case Manager Harris requested plaintiff's medical restrictions be changed and assigned him to the cannery in retaliation for a letter that plaintiff sent to Collins in July 2005, a grievance that plaintiff filed in August 2005, and a lawsuit that he filed in 1989 against two other correctional officers.  (Docket Entry No.1, pages 3, 9).  Plaintiff also believes that Collins and Harris retaliated against him because he is Native American.  (Docket Entry No.22, page 1).

Plaintiff further claims defendants Linda Peterson, Deborah Hennenberg, Felicia Bouttee, Alice Pacheco, and Paul Jung, and all named defendants, intended to cause him to suffer unnecessary pain and to punish him in retaliation for refusing to endure the unnecessary pain in his work assignment.  (Docket Entry No.30, pages 7-8).

To state a valid claim for retaliation under section 1983, an inmate must allege more than his personal belief that he was the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).  Mere conclusory allegations of retaliation are not enough.  *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988).  He must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999).  The inmate must allege facts showing that a defendant possessed a retaliatory motive. *See Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988); *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985).  He "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may

plausibly be inferred.'" *Id.* (citation omitted).  Moreover, he must show that "but for" a retaliatory motive, the defendants would not have engaged in the action.  *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).

Plaintiff's chronology of events does not give rise to an inference of a retaliatory motive to change plaintiff's medical restrictions in 2004 and to assign him to the cannery.  The 1989 lawsuit occurred years before the restrictions were changed and plaintiff states no facts to show that defendants were upset or even aware of the suit.  The 2005 grievances and plaintiff's letter to Collins were filed months after Adams changed the medical restrictions on the HSM-18 in November, 2004.  Plaintiff states no facts to show that Collins, Harris, or anyone requested that Adams change plaintiff's medical restrictions.  To the extent that plaintiff claims that Collins or Harris requested that Owusu change the restrictions, the Court notes that Dr. Owusu did not modify plaintiff's medical restrictions, except to add a four-hour work restriction.

Likewise, the record does not show that Collins, Harris, or any other defendant expressed a dislike for Native Americans.  Plaintiff's allegations of retaliation and discrimination with respect to all defendants are speculative and conclusory.  Accordingly, plaintiff's claims of retaliation by all defendants are subject to dismissal.

### 3. Job Assignment

Plaintiff contends that defendants violated the Eighth Amendment by assigning him to the cannery and laundry in violation of his medical restrictions.   "[P]rison work requirements which compel inmates to perform physical labor which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment."  *Howard v. King,* 707 F.2d 215, 219 (5th Cir. 1983).  If a prison official knowingly assigns an inmate to a job he or she realizes may significantly aggravate a serious physical ailment, then such a decision

would constitute deliberate indifference to serious medical needs that may violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989); *see also Calhoun v. Hargrove*, 312 F.3d 730, 734-35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels). A negligent assignment to work that is beyond the prisoner's physical abilities, however, is not unconstitutional. *Jackson*, 864 F.2d at 1246. Moreover, a mere disagreement about a work assignment does not amount to deliberate indifference. *See e.g. Douglas v. McCasland*, 194 Fed. Appx. 192 (5th Cir. 2006) (finding claim frivolous where plaintiff fails to show that defendants knowingly assigned him work that would significantly aggravate his medical condition); *Freeman v. Alford*, 48 F.3d 530 (5th Cir. 1995) (not designated for publication). Moreover, to succeed on a civil rights claim, plaintiff must show that his job assignment significantly aggravated a serious physical ailment. *Jackson*, 864 F.2d at 1246-47.

The record shows that plaintiff was initially assigned to the cannery on November 18, 2004, after Dr. Adams modified his medical restrictions on the HSM-18. (Docket Entry No.42-14, pages 5-6). Thereafter, plaintiff submitted several sick call requests complaining of the modifications to his HSM-18 and of increasing pain in his left shoulder and neck from working at a conveyor in the cannery. (Docket Entry No.42-4, pages 9-11). On December 14, 2004, Dr. Owusu noted that plaintiff had been medically unassigned but was now reassigned to the cannery. (Docket Entry No. 43, pages 3-4). He observed that plaintiff walked with a cane and appeared to be in pain. (*Id.*). Owusu recommended that plaintiff be assigned to the medical

utility squad.   (*Id.*).   The same day, plaintiff was re-assigned to the medical utility squad. (Docket Entry No.42-14, page 6).

Plaintiff remained medically unassigned for almost eight months.   (Docket Entry No.42-14, page 4).   Plaintiff returned to the Terrell Unit on July 25, 2005, and was screened by medical personnel on the 27th and 28th.   (Docket Entry No.42-4, pages 19-22).   Plaintiff's medical restrictions on his HSM-18 were not modified.   On July 27, 2005, plaintiff was again assigned to the cannery.   (Docket Entry No.42-14, page 4).

Plaintiff attempted to have his restrictions modified.   On August 5, 9, and 18, plaintiff submitted sick call requests on see a doctor so that he would return to the medically unassigned status but he did not complain of a specific injury from the work.   (Docket Entry No.42-3, pages 6, 10, 13).   Plaintiff was informed that the medical staff did not recommend jobs and that he should go up the chain of command in security if restrictions were not being followed.   (*Id.*).   He complained in other sick call requests of pain, dizziness, and seizures that he attributed to working in the cannery.[4]   He refused to turn out for work on August 8, 9, 10, and 22, 2005, was given a disciplinary case for each violation.   (Docket Entry No.42-10, pages 3, 4, 5, 6).

---

[4] On August 8, 2005, he complained of pain in his left shoulder.  (Docket Entry No.42-3, page 11).  He was asked if there had been any recent trauma.  (*Id.*).  On August 11, 2005, he requested to see a doctor for severe pain in his lower back and shoulder.  (Docket Entry No.42-3, page 8).  He was instructed to pick up Tylenol from the pill window.  (*Id.*).  On August 16, 2005, plaintiff was seen in the infirmary by Nurse Hennenberg's as a walk-in on a complaint that he was hot and dizzy in the cannery.  (Docket Entry No.42-2, page 24).  Plaintiff demanded to see a doctor about his restrictions.  (*Id.*).  Plaintiff was told to submit a sick call request.  (*Id.*).  On August 16, 2005, plaintiff complained of black-out seizures while at work in the cannery.  (Docket Entry No.42-3, page 7).  On August 18, 2005, Physician's Assistant Jung saw plaintiff for complaints of seizures and work in the cannery. (Docket Entry No.42-2, page 11).  Jung noted no clear history of seizures and advised plaintiff to discuss his work assignment with security.  (*Id.*).  On August 28, 2005, plaintiff requested Dr. Owusu to order a new back brace to replace the one that was taken when he returned from a bench warrant because the work in the cannery was aggravating his lower back pain.  (Docket Entry No.42-3, page 4).  Plaintiff was informed that the infirmary did not issue back braces and questioned about the problem with his vertebra.  (*Id.*).

On August 25, 2005, plaintiff was assigned to a special cannery force.  (Docket Entry No.42-14, page 4).  Plaintiff submitted Step 1 Grievance No.2005227319 the next day, complaining that he was wrongfully assigned to the cannery because of his medical restrictions. (Docket Entry No.42-11, pages5-6).  Warden Collins responded on September 13, 2005, that the Medical Department had reported that plaintiff had been examined on September 1, 2005, and the provider found no medical indications to add further restrictions.  (*Id.*, page 6).  In response to plaintiff's Step 2 Grievance, the Director of Clinical Services noted that since November 16, 2004, plaintiff's work restrictions had not changed, except on September 13, 2005, a physician added a four-hour limited work restriction.  (*Id.*, page 4).

Plaintiff did, however, experience some problems while at work, which medical personnel found suspect.  On September 1, 2005, Nurse Pacheco was called to the cannery, where she found plaintiff was on the floor complaining that he could not move because he hurt his back.  (Docket Entry No.42-2, page 22).  Plaintiff indicated that his cane slipped and he twisted at the waist and fell.  (*Id.*).  Pacheco noted that plaintiff ambulated to the wheelchair and bent over at his waist; he also complained of pain and of working in the cannery.  (*Id.*).  Plaintiff told Pacheco that he had warned everyone that he was going to fall.  (*Id.*).  Pacheco referred him to a provider.  Pacheco later observed plaintiff walking out of medical with a cane and down the hall at a rapid pace.  (*Id.*, page 21).  He turned at the waist when called from another offender, laughed and continued to walk at a rapid pace and raised his hand over his head to wave at another offender.  (*Id.*).

Plaintiff was seen by Nurse Patricia Jones on the same day.  (*Id.*, pages 9-10). She noted that plaintiff had made it clear that he disliked his job in the cannery; she also noted that plaintiff had recently come up with a new complaint of seizures for ten years that had never

been documented.  (*Id.,* page 10).  Jones observed plaintiff sitting in a chair in the nurse's station

for three hours, eating lunch and talking with other offenders.  (*Id.*).  She noted that he did not

grimace or guard his movements; he walked using his cane and got on the table without

assistance.  (*Id.*).  Plaintiff, however, complained of severe pain in the L4, L5, and L6, and said

that he had suffered such pain since 1978 and that he had been declared disabled in 1986.

Plaintiff also stated that he had lower back x-rays in 1989, but none since.  (*Id.*).  Jones ordered

x-rays.  (*Id.*).

The x-ray report dated December 12, 2005, showed some narrowing of plaintiff's

L4-L5 disc and evidence of minimal spondylolisthesis of L5 on S1; spondylolysis at the L5 level

could not be ruled out, but no acute pathology was seen.  (Docket Entry No.44-5, page 3).  Nurse

Jones reviewed the report on December 27, 2005, and noted that no further action was required.

(Docket Entry No.42-8, pages 12-13).

Dr. Owens opines, as follows, that plaintiff's complaints of pain were

exaggerated:

> Mr. Childress has a subjective complaint of pain in his back; however
> neither the radiology studies nor the objective findings on physical
> examination correlate with his presentation.  This is not uncommon in the
> prison setting.   In my experience, correctional patients will often
> exaggerate their subjective complaints in an effort to garner the analgesics
> or work modifications they seek, a circumstance known as secondary gain.
> In these cases, as with Mr. Childress, their past histories of injury are not
> documented and more importantly, their objective findings do not support
> their complaint.

(Docket Entry No.47-2, page 3).

19

Plaintiff, nevertheless, continued to submit sick call requests seeking modification of his work restrictions.[5]  (Docket Entry No.42-3, pages 1-2).  On September 8, 2005, plaintiff's job was changed to the laundry by the UCC.  (Docket Entry No.42-14, page 4).  On September 9, 2005, plaintiff filed a sick call request complaining that his problems went from bad to worse and requesting a four-hour work restriction.  (Docket Entry No.42-2, page 25).  On September 13, 2005, Dr. Owusu added a four-hour limited work restriction.  (Docket Entries No.42-11, page 4, No.44-5, page 20).  Dr. Owusu examined plaintiff on October 12, 2005, for complaints of chronic lower back pain.  (Docket Entry No.43-3, pages 7-8).  Plaintiff was assigned as a folder in the laundry on July 3, 2006.  (Docket Entry No.42-14, page 4).

On October 10, 2006, submitted a sick call request to see a doctor about getting all his medical restrictions put back on the computer because of his "painful medical chronic conditions."  (Docket Entry No.44, page 19).  In response, plaintiff was asked "what can't you do?"  (*Id.*).  On November 30, 2006, Dr. Owusu recommended that plaintiff be medically unassigned for three weeks because of skin condition and noted the same on plaintiff's HSM-18.  (Docket Entries No.42-6, page 11, No.44-5, page 19).  On December 28, 2006, Dr. Owusu noted plaintiff's work assignment restrictions on the HSM-18 as no walking over 500 yards, no lifting over twenty pounds, and a four-hour limited work restriction.  (Docket Entry No.44-5, page 18).  At the expiration of the three-week period, plaintiff was assigned to the medical utility squad.  (Docket Entry No.42-14, page 3).  The record does not reflect that plaintiff was re-assigned to the cannery or the laundry thereafter.

---

[5] On September 6, 2005, plaintiff submitted a sick call request seeking crutches and a four-hour work restriction. (Docket Entry No.42-3, page 2).  On September 8, 2005, plaintiff submitted another sick call request stating that the UCC ordered him to see Dr. Owusu for a modification to his work restrictions.  (Docket Entry No.42-3, page 1). Plaintiff was advised that  classification would send him to medical and no order that he been seen.  (*Id.*).  Plaintiff was also advised that medical staff was waiting on the x-ray report.  (*Id.*).

In short, the record reflects that TDCJ and UTMB officials at the Terrell Unit were aware of plaintiff's complaints regarding his work restrictions, his back and shoulder pain, and his dislike of his job assignments.  Medical personnel, however, found that plaintiff's complaints of physical injury and pain did not comport with radiology reports, medical examinations, or their observations of plaintiff in the infirmary.  Plaintiff's medical restrictions were modified in accordance with medical decisions based upon a physical examination and not upon plaintiff's subjective complaints.

Plaintiff concedes that his back injury is not crippling all the time; he complains that "the work he was assigned to do increase[d] the pain and aggravated the lower back long standing medical painful condition."  (Docket Entry No.50, page 9).  He explains that "[t]he fact that plaintiff did received [sic] somewhat effective treatment of some of his medical conditions, that does not mean that the treatment to his lower back painful condition, including work assignment[,] was effective within the requirement of the statutory duty imposed upon the defendants by color of their employment with TDCJ-ID and U.T.M.B." (*Id.*).  Plaintiff, however, states no facts to show that defendants assigned a job in the cannery and the laundry that did not comport with the restrictions as modified by Drs. Adams and Owusu.  Moreover, plaintiff's medical records do not reflect that plaintiff's work in either job caused him to suffer substantial physical harm.

Accordingly, plaintiff fails to show that defendants violated the Eighth Amendment by the work that he was assigned to perform at the Terrell Unit.  Defendants, therefore, are entitled to summary judgment on their qualified immunity claim.

4. Deliberate Indifference to Medical Condition

   The Eighth Amendment's prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The plaintiff must also show that prison officials acted or failed to act with deliberate indifference to that risk. *Id.* at 834. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually aware of the risk, yet consciously disregarded it. *Id.* at 837, 839; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). "[F]acts underlying a claim of 'deliberate indifference' must clearly evince the medical need in question and the alleged official dereliction." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Id.* Mere negligence does not constitute a section 1983 cause of action. *Estelle*, 429 U.S. at 106; *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) ("the subjective intent to cause harm cannot be inferred from a ... failure to act reasonably").

   Deliberate indifference to serious medical needs may be manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle*, 429 U.S. at 104-05. Delay in obtaining medical treatment does not constitute deliberate indifference unless it is shown that the delay resulted in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

   To the extent that plaintiff claims that Dr. Adams was deliberately indifferent to his serious medical needs when he removed eight permanent work restrictions without

conducting a physical examination, plaintiff fails to contravene summary judgment evidence that shows otherwise.

Likewise, plaintiff fails to contravene summary judgment evidence that shows that Dr. Owusu was not deliberately indifferent to plaintiff's serious medical needs because he refused to restore the eight permanent work restrictions.  Plaintiff's medical records and expert opinion reflect that the restrictions were appropriate.  Moreover, Dr. Owusu was attentive to plaintiff's complaints.  He recommended on one occasion that plaintiff be moved to the medical utility squad; he also added a four hour work restriction upon plaintiff's request, and recommended that plaintiff be medically unassigned because of a skin condition.

Moreover, the record does not support plaintiff's contention that Dr. Owusu was deliberately indifferent to plaintiff's other serious medical needs, such as plaintiff's hand, heel, and nose conditions.  (Docket Entry No.30).  The record shows that plaintiff requested to see Dr. Owusu about carpal tunnel syndrome surgery in September, 2006, and was told that he had an appointment in December with a doctor.  (Docket Entry No.44-2, page 12).  The record does not show that Dr. Owusu examined plaintiff for carpal tunnel syndrome or that he refused plaintiff's request for a referral to a hand specialist.  Instead, plaintiff was examined by other medical providers, one of whom referred plaintiff to an orthopedic hand specialist.[6]  (Docket Entries No.42-7, page 12; No.43, pages 15, 17).

---

[6] On October 5, 2006, after plaintiff submitted the sick call request about his hand, plaintiff was given a physical examination by Todd Bouton; plaintiff reported no complaints to Bouton.  (Docket Entry No.43-3, pages 4-5).  On July 17, 2007, plaintiff was seen by Dr. Ward for wrist pain; she referred him to an orthopedic hand specialist.  (Docket Entries No.42-7, page 12; No.43, pages 15, 17).  On February 7, 2008, plaintiff saw Nurse Nwodo, who noted that plaintiff's left hand brace was too large and that Ms. Kennington would replace the brace with a smaller one.  (Docket Entry No.43, page 10).  On February 8, 2008, plaintiff requested another appointment to discuss hand surgery.  (Docket Entry No.43-7, page 4).  Plaintiff was informed that the issue had been addressed at the February 8, 2008 clinic visit and that a new hand brace was to be issued.  (*Id.*).

The record also shows that Dr. Owusu was responsive to plaintiff's complaints of sinus congestion and a possible deviated septum; he ordered an x-ray of plaintiff's nose. (Docket Entry No.42-7, page 2). Owusu noted upon review of the x-rays, which showed a "slight rightward deviation of bony septum," that he would refer plaintiff to a specialist if plaintiff continued to have problems. (Docket Entry No.42-6, page 25). When plaintiff requested to see Dr. Owuso on February 6, 2008, about nose x-rays taken on December 19, 2007, he was referred to the ear, nose, and throat specialist . (Docket Entry No.43-7, page 6).

To the extent that plaintiff complains of Dr. Owusu's failure to prescribe an effective medication for heel pain, he fails to state an actionable claim. Without more, plaintiff's dissatisfaction with the medical treatment he received does not mean that he suffered deliberate indifference. *See e.g., Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding inmate's "disagreement with his medical treatment" not sufficient to show Eighth Amendment violation); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979) (finding "[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth Amendment violation).

Plaintiff further complains that defendants Linda Peterson, Deborah Hennenberg, Felicia Bouttee, Alice Pacheco, and Paul Jung "have repeatedly interfered with my trying to [indecipherable] doctor and effective medical treatment of my medical needs." (Docket Entry No.30, page 7). Plaintiff complained in his original complaint that Peterson refused to inform Case Manager Harris that plaintiff's job assignment was hazardous to his health, although he noted that she tried to assign him to a different section of the cannery, where it was not too hot. (Docket Entry No.1, page 8). He complained that Nurse Hennenberg, Physician's Assistant Jung, and Nurse Pacheco refused his request to see a doctor about his medical restrictions. (*Id.*).

24

Plaintiff also complained that Physician's Assistant Bouttee prescribed Tylenol and refused to talk with Peterson about the medical restrictions.  (*Id.,* page 9).  He further complained that Hennenberg and Jung did not provide adequate treatment for his seizures in mid-August, 2008. (*Id.*).

The record, however, does not reflect that any defendant intentionally or deliberately denied plaintiff access to medical care with the intent that he should suffer harm. Instead, the record reflects that plaintiff persistently attempted to see a physician, whom he thought would change his medical restrictions or request that he be re-assigned to a new job, and that these defendants did not facilitate plaintiff's attempts to see Dr. Owusu or to change his job assignment.  Likewise, the record reflects that plaintiff received medical attention for his alleged seizures in mid-August, although not the treatment that he desired or thought would facilitate a job change.

Dr. Owens opined that plaintiff "was, and has been, seen promptly and repeatedly by healthcare staff for his complaints during incarceration."  (Docket Entry No.47-2, page 2). The record supports Dr. Owens's attestation.

Because plaintiff has not shown a genuine issue of material fact on his Eighth Amendment claims, such claims against all defendants are subject to dismissal.

## IV. CONCLUSION

Based on the foregoing, the Court ORDERS the following:

1. Defendants' motion for summary judgment (Docket Entry No.42) is GRANTED.  All claims against defendants Anthony J. Collins, Dr. Charles D. Adams, and Dr. Kwabena Owusu are DISMISSED WITH PREJUDICE.

2. All claims against all other defendants are DISMISSED WITH PREJUDICE as legally frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B).

3.   All pending motions, if any, ARE DENIED.

4.   This civil action is DISMISSED WITH PREJUDICE.

It is so ORDERED.

SIGNED at Houston, Texas, this 26th day of March, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE